UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
***ATLANTA*** DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 25-50646-jwc |
| **Hyun Wook Lee,** <br> **Nari Jung,** | : | CHAPTER 13 |
| Debtors. | : | |
| **PNC BANK, NATIONAL ASSOCIATION** | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| **Hyun Wook Lee,** <br> **Debtor.** <br> **Nari Jung,** <br> **Joint Debtor.** <br> **Nancy J, Whaley,** <br> **Trustee.** | : | |
| Respondents. | : | |

**NOTICE OF HEARING**

**PLEASE TAKE NOTICE** that ***PNC BANK, NATIONAL ASSOCIATION (“Movant”)*** has filed a ***Motion for Relief from Stay (the “Motion”)*** and related papers with the Court seeking an order ***granting relief from the automatic stay***.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the ***Motion*** at ***10:30 A.M.*** on ***November 18th, 2025*** in Courtroom ***1203***, United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303, which must be attended in person, unless the Court orders otherwise.

Your rights may be affected by the Court’s ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how

and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk before the hearing. The address of the Clerk's Office is: Clerk, U. S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, SW, Atlanta Georgia 30303. You must also mail a copy of your response to the undersigned at the address stated below.

***If a hearing on the Motion cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the Motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.***

Dated: ***10/28/2025***

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
*ATLANTA* DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 25-50646-jwc |
| **Hyun Wook Lee,**<br>**Nari Jung,** | : | CHAPTER 13 |
| Debtors. | : | |
| **PNC BANK, NATIONAL ASSOCIATION** | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| **Hyun Wook Lee,**<br>**Debtor.**<br>**Nari Jung,**<br>**Joint Debtor.**<br>**Nancy J, Whaley,**<br>**Trustee.** | : | |
| Respondents. | : | |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**

COMES NOW, PNC BANK, NATIONAL ASSOCIATION, (hereinafter referred to as "Movant"), by and through its undersigned counsel, moves for relief from the automatic stay and alleges as follows:

1.

The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 362, FRBP 4001(a), and the various other applicable provisions of the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the laws of the United States of America.

2.

Hyun Wook Lee and Nari Jung, (hereinafter referred to as "Debtors"), filed a joint petition for relief under Chapter 13 of the Bankruptcy Code on January 21, 2025.

3.

Movant is the holder or servicer of a loan secured by certain real property in which the Debtors have an interest. Movant holds a security interest in the Debtors' real property now or formerly known as 2978 WOODWARD DOWN TRL, BUFORD, GA 30519 (hereinafter referred to as "Property") by virtue of a Security Deed dated May 17, 2022. Said Security Deed secures a Note in the original principal amount of $50,000.00. The promissory note has been duly endorsed. Secured Creditor is the holder of the note ("noteholder"), and is either the original mortgagee, beneficiary or assignee of the security instrument for the referenced loan. Noteholder directly or through an agent has possession of the promissory note and the promissory note is either made payable to noteholder or has been duly endorsed.

4.

Movant alleges that the Debtors are in default to Movant under the terms of the loan documents, having failed to make certain mortgage payments that have come due. As of October 21, 2025, the arrearage owed to Movant is $3,331.64 and consists of eight (8) monthly mortgage payments at $545.61 each, less a suspense balance of $1,033.24. An additional payment will come due November 21, 2025 and on the first day of each month thereafter until the loan is paid in full.

5.

The current unpaid principal balance due under the loan documents is approximately $47,956.54. Upon knowledge and belief, the outstanding balance due on the 1st priority Lien on the property held by United Wholesale Mortgage, LLC is

approximately $245,139.65. The Property is most recently valued at $427,200.00 by the Gwinnett County Tax Assessor's Office.

6.

Movant's security interest in the Property is not adequately protected due to the Debtors' failure to maintain the mortgage payments.

7.

Movant has incurred attorney's fees and costs as a result of filing this motion. These fees and costs are recoverable pursuant to the loan documents, and Movant seeks leave to recover these fees and costs under the remedies available therein.

8.

Pursuant to 11 U.S.C. § 362, Movant alleges that sufficient cause, including lack of adequate protection, exists for the automatic stay to be terminated.

WHEREFORE, Movant respectfully prays to the Court as follows:

(a) That the automatic stay under 11 U.S.C. § 362 be modified to allow Movant to pursue state remedies to protect its security interest in the Property, including, but not limited to, advertising to effectuate a foreclosure sale and gaining possession of the Property; to contact the Debtors via telephone or written correspondence to discuss potential loan workout or loss mitigation opportunities; and to perform property preservation as appropriate;

(b) That Movant's attorney's fees and costs incurred in filing and prosecuting this Motion be recoverable as pursuant to the loan

documents and remedies available therein;

(c) That the fourteen (14) day stay of Bankruptcy Rule 4001(a)(4) be waived;

(d) That Movant be permitted to offer and provide Debtors with information regarding a potential forbearance agreement, loan modification, refinance agreement, or other loan workout/loss mitigation agreement, and to enter into such an agreement with Debtors.

(e) For such other and further relief the Court deems just and proper.

Date: 10/28/2025

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith_
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
*ATLANTA* DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 25-50646-jwc |
| **Hyun Wook Lee,** **Nari Jung,** | : | CHAPTER 13 |
| Debtors. | : | |
| **PNC BANK, NATIONAL ASSOCIATION** | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| **Hyun Wook Lee**, **Debtor.** | : | |
| **Nari Jung,** **Joint Debtor.** | : | |
| **Nancy J, Whaley**, **Trustee.** | : | |
| Respondents. | : | |

**<u>Certificate of Service</u>**

I hereby certify that on the ***28th*** day of ***October, 2025***, I electronically filed the foregoing ***Motion for Relief from Stay and Notice of Hearing*** using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

***Brandon K. Honsalek***
***Nancy J. Whaley, Standing Chapter 13 Trustee***

I further certify that on this day I caused a copy of this document to be served via ***United States First Class Mail,*** on the following parties at the address shown for each.

***Hyun Wook Lee***
***2978 Woodward Down Trl***
***Buford, GA 30519-5048***

*Nari Jung*
*2978 Woodward Down Trl*
*Buford, GA 30519-5048*

Dated: ***10/28/2025***

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith_
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

# SUPPORTING DOCS

**Choice Home Equity Line of Credit - Principal and Interest**

PNC BANK

**Borrower:** HYUN WOOK LEE
**Lender:** PNC Bank, National Association ("PNC Bank, N.A.")
**Date of this Agreement:** May 17, 2022

**AGREEMENT AND DISCLOSURE STATEMENT**

Payment Due Date: 21
Account Number: [redacted]
Maximum Credit Limit: $50,000.00
Name of Borrower(s):
HYUN WOOK LEE

Address:
2978 WOODWARD DOWN TRL
BUFORD, GA 30519

☒ REGULAR ACCOUNT

Automatic Payment Plan Discount: 0.250 percentage points off Base Margin
Checking Account Number: [redacted]
In Name(s) of: LEE, HYUN WOOK

The Initial Daily Periodic Rates and Initial Annual Percentage Rates disclosed in this Agreement are based on the Indexes in effect as of May 16, 2022. If any of the Indexes have recently changed, your actual Initial Daily Periodic Rates and Annual Percentage Rates may be different.

**VARIABLE RATE PART**
Initial Daily Periodic Rate: 0.0134% per day
Initial Corresponding **ANNUAL PERCENTAGE RATE:** 4.880% per year
Base Margin: 1.630 percentage points

The Corresponding **ANNUAL PERCENTAGE RATE** will never be less than 2.25%, regardless of the value of the Index in effect at any time, and even if a Discount applies to the Base Margin. See the section below entitled "How we Determine the Rate on the Variable Rate Part" for the rules relating to interest rate changes and limits.

**FIXED RATE PARTS**
The Initial Daily Periodic Rate, Initial Corresponding ANNUAL PERCENTAGE RATE, and the applicable Margin for Fixed Rate Part transfers will depend upon the amount and term of the particular loan that you request. These Rates and Margins are shown in Table 1 at the end of this Agreement.

**During the Draw Period, we frequently feature promotions that offer you a lower Daily Periodic Rate and Annual Percentage Rate for Fixed Rate Part transfers. Please contact Customer Service at 1-888-762-2265 to determine whether such a promotional rate is available to you that is lower than the then current contract rate.**

1. **OTHER FINANCE CHARGES**

   **(a)** Transfer Fee: $100.00 per transfer

   You must pay a Transfer Fee each time you make a transfer to a Fixed Rate Part, except this fee is waived if you establish a Fixed Rate Part at credit line origination.

   **(b) FINANCE CHARGES** required to open this Account: To open this Account, you must pay the following **FINANCE CHARGES** on or before the date this Account becomes effective (You may not use a loan from this Account to pay these Finance Charges): $0.00

2. **CLOSING COSTS: $0.00**

3. **ANNUAL FEE** ☒ Annual Fee: $50.00

The Annual Fee will be charged to your Account by the second Billing Cycle following account opening and each year thereafter, during the Draw Period.

**Agreement Index.** For your reference, an index to this Agreement is provided on page 11.

**1. Definitions.** In this Agreement, the following definitions apply: "Agreement" means this Choice Home Equity Line of Credit Agreement and Disclosure Statement, the Mortgage and any amendment or addendum to this Agreement.



[redacted]

**Choice Home Equity Line of Credit - Principal and Interest**

PNC BANK

**Borrower:** HYUN WOOK LEE
**Lender:** PNC Bank, National Association ("PNC Bank, N.A.")
**Date of this Agreement:** May 17, 2022

## AGREEMENT AND DISCLOSURE STATEMENT

**Parties to this Agreement.**

"We," "us," "our" or "Lender" means the Lender named above or any person or entity to whom the rights of the Lender have been assigned.

"You," "your," "yours" or "Borrower" means each and every person signing this Agreement as a Borrower, whether one or more persons sign.

**Parts of the Account.**

"Account" means the Choice Home Equity Line of Credit Account evidenced by this Agreement.

"Variable Rate Part" means the part of this Account from which loans will be made. The interest rate on the Variable Rate Part may change. Changes in the interest rate will affect existing balances and new loans.

"Fixed Rate Part" means the part of this Account to which you may transfer all or a portion of the principal balance in the Variable Rate Part. Changes in the interest rate will affect transfers to a new Fixed Rate Part, but will not affect the interest rate on a Fixed Rate Part once it is established.

**Types of Accounts.**

"Regular Account" means an Account which is not eligible for an Employee Benefit.

**Other Terms Used in This Agreement.**

"Automatic Payment Plan" means that you have authorized us to deduct the Minimum Payment each month from an eligible checking account, on or about the Payment Due Date.

"Billing Cycle" means the interval between the dates on which monthly statements are prepared or would have been prepared if one were required under the paragraph called "Monthly Statements."

"Choice Access Card" and "Card" mean the credit card or cards issued by Lender to each Borrower in connection with this Account.

"Close this Account" means that (1) this Account has been Terminated either by you or by us (or is in the Repayment Period); (2) this Account has a zero outstanding balance; and (3) we are obligated, upon payment of the accrued interest for any partial Billing Cycle to Satisfy the Mortgage of Record.

"Draw Period" means the first phase of the Account during which you can obtain loans from the Variable Rate Part and make transfers to Fixed Rate Parts. The Draw Period begins after we approve the credit, you have signed this Agreement and no one has rescinded this Agreement within the time provided under the Notice of Right to Cancel.

"Maximum Credit Limit" or "Maximum Credit" means the dollar amount of credit available to you. The total of the principal balances of all parts of the Account plus Choice Access Card transactions which have been authorized but not yet posted to the Account may not exceed the Maximum Credit Limit.

"Mortgage" means the mortgage, deed of trust or security deed given by the Borrower and/or the other owner of the Mortgaged Premises to secure this Account.

"Mortgaged Premises" means the property covered by the Mortgage given to secure this Account, as is more particularly described in the Mortgage.

"Repayment Period" means the phase of the Account after the Draw Period has ended, during which any remaining balance must be paid. You may not obtain new loans or make transfers during the Repayment Period. The Repayment Period will begin with the first Billing Cycle following the end of the Draw Period and will continue until you have paid the balance in full.

"Satisfy the Mortgage of Record" means that, in accordance with applicable law or custom, the Lender records in the appropriate state or local government office evidence that the debt has been paid and that the Mortgage is no longer an encumbrance on the Mortgaged Premises, or the Lender provides evidence that the debt has been paid and that the Mortgage is no longer an encumbrance on the Mortgaged Premises to Borrower or to some other person authorized to receive it.

"Suspension" means that you will no longer be able to obtain loans, obtain any extensions of credit or make transfers to Fixed Rate Parts. Suspension affects the Account temporarily, until the condition which caused the suspension no longer exists.

"Termination" means that you will no longer be able to obtain loans, obtain any extensions of credit or make transfers to Fixed Rate Parts. Termination affects the Account permanently.

**2. General Description of the Account.** This Account is a revolving loan Account, sometimes called a line of credit. It is secured by the Mortgage. You may obtain loans on this Account from time to time during the Draw Period by writing checks, by using the Choice Access Card, if applicable, or by using other methods which we may permit. We will add the loans to the balance of the Variable Rate Part; you will repay the loans by making monthly payments. As you repay the balance, we will again make the credit available to you, during the Draw Period. At the end of the Draw Period, you must repay any outstanding balance in the Variable Rate Part during the Repayment Period. We will charge a Finance Charge on the outstanding principal balance on the Variable Rate Part at rates that may change from time to time. Each new rate will apply to the outstanding balance in your Variable Rate Part and all new borrowings until the rate changes again.

During the Draw Period, you may transfer all or a portion of the principal balance from the Variable Rate Part to a Fixed Rate Part. We will charge a Finance Charge, called a Transfer Fee, each time you make a transfer. We will charge you a Finance Charge on the outstanding principal balance on a Fixed Rate Part. Changes in the interest rate will affect transfers to a new Fixed Rate Part, but will not affect the interest rate on a Fixed Rate Part once it is established. You may not transfer additional balances to an existing Fixed Rate Part. There is no limit on the number of Fixed Rate Parts you may establish during the Draw Period; however, you may have no more than five Fixed Rate Parts open at any time in any Billing Cycle plus one Fixed Rate Part if you established it when you opened the Account.

You may not make a new loan that would cause the total of the principal balances of the Variable Rate Part and all Fixed Rate Parts plus Choice Access Card transactions that have been authorized but not posted to the Account to exceed the Maximum Credit Limit. You may not make a new loan or make a transfer to a Fixed Rate Part during any period of Suspension or after Termination.

If more than one name is listed in the "Name of Borrower(s)" paragraph above, each individual named has authority to write checks, use the Card, or obtain funds from this Account by any other means as we may, from time to time, permit without the signature or



[redacted]

endorsement of any other Borrower. Each Borrower has the right to establish a Fixed Rate Part without the signature of any other Borrower.

**3. Draw and Repayment Periods; Term of a Fixed Rate Part.** Your Account will consist of two periods, a Draw Period and a Repayment Period. You are permitted to make new loans and establish new Fixed Rate Parts, from time to time, only during the Draw Period. The Draw Period will end on the last day of the Billing Cycle in which the tenth anniversary of the opening of the Account occurs.

The length of the repayment Period on the Variable Rate Part will be 30 years. Depending on (a) the principal balance in the Variable Rate Part (i) at the end of the first Billing Cycle in the Repayment Period, or (ii) at the end of a Billing Cycle in the Repayment Period in which a Choice Access Card transaction is posted, and (b) the Annual Percentage Rate(s) which apply, your Minimum Payments may repay the Variable Rate Part in less than 30 years. The term of a Fixed Rate Part will be not less than five years and not more than thirty years, as selected by you.

**4. Loans.** Subject to the conditions stated in the paragraph called "Our agreement to make loans," below, during the Draw Period, you can obtain loans on this Account in any of the following ways, and in any other way that we may later permit:

**(a) Checks.** You may write checks on this Account in an amount up to your maximum credit limit. You must use one of the special checks that we will give you for this purpose. Checks must be dated, drawn and given to the payee during the Draw Period and received by us during the Draw Period or within five business days after the end of the Draw Period.

**(b) Our agreement to make loans.** We agree to make loans to you on this Account by paying checks you write on this Account, or through such other methods as we may permit including by paying merchants on your behalf for Card Transactions and by processing ATM transactions. However, we are not obligated to make a loan to you on this Account if the loan would cause the total of the principal balances on all parts of this Account plus Choice Access Card transactions which have been authorized, but not posted to the Account, to exceed the Maximum Credit Limit. We are not obligated to make a loan to you on this Account for any check or other method of obtaining credit such as a Card transaction made by you or received by us after this Account is Terminated or during any period when further extensions of credit are prohibited or Suspended, as provided for in this Agreement. If we make a loan to you on a transaction you initiate, but we are not obligated to make, it is nevertheless a loan on this Account.

**(c) Transfers to Fixed Rate Parts.** Subject to the limitations on Transfers stated in the paragraph called "Establishing a New Fixed Rate Part," we agree to transfer balances from the Variable Rate Part to a Fixed Rate Part during the Draw Period, if requested by you in the manner required by this Agreement.

**(d) Transfers from Fixed Rate Parts.** You may also transfer balances from a Fixed Rate Part to the Variable Rate Part during the Draw Period, if requested in the manner required by us. If you request such a transfer, you must transfer the entire amount of the principal balance remaining in the Fixed Rate Part at the time of the request. Transfers of partial balances are not permitted. Any balances transferred to the Variable Rate Part will become subject to all terms of this Agreement relating to the Variable Rate Part, including provisions relating to the determination of interest and how it may vary, and how payments are determined. Also, any discount that may have applied to the Fixed Rate Part Margin will no longer apply to the balance that is transferred to the Variable Rate Part.

**(e) Right to Make Loans and Transfers.** Only Borrowers who sign this Agreement have the right to make loans and Transfers on this Account; an owner of the Mortgaged Premises who is not a Borrower does not have the right to make loans or Transfers.

**(f) Choice Access Cards.** If Borrower requests a CHOICE Access Card at the time of account opening or subsequently requests a card, the following is applicable.

(i) Each Borrower agrees to sign the Card on the back, at the place for Borrower's signature, and to follow the instructions provided with the Card to activate the Card. If you do not sign and activate the Card, you may not be able to use it. You may not be able to use the Card after the expiration date stated on the Card.

(ii) You may use the Card to obtain goods or services from merchants who accept the Card. You may use the Card to obtain cash advances from the Lender and from other persons who accept the Card for this purpose. You may use the Card to pay bills to other persons who accept the Card for this purpose. You may use the Card at any ATM or other electronic or automated cash dispensing device.

(iii) When you initiate a Card transaction, the merchant may request us to authorize the transaction using the Card authorization network. If we receive a request to authorize the transaction, we will tell the merchant whether or not we will make a loan on the Account and pay the merchant the amount of the transaction, subject to certain conditions. You agree that we can respond to any merchant who requests an authorization.

(iv) We will not pay any Card transaction after you have reported the Card lost or stolen; we may not pay any Card transaction that is not made by a Borrower or which we reasonably suspect is not made by a Borrower.

(v) If you make a Card transaction in a currency other than U.S. dollars, the company that processes the transaction will convert the amount of the transaction to U.S. dollars and we will charge your Account for the converted amount. The currency exchange will be done by a method and at a rate determined by the company that processes the transaction.

(vi) If you withdraw cash from an ATM operated by us, we will not charge you a fee for the ATM transaction, other than the fees disclosed in this Agreement. If you withdraw cash from an ATM which is operated by someone other than us, you may be charged a fee by the operator of the ATM.

(vii) The following limitations apply to Card transactions:

(A) You may not use the Card as a debit card, using a personal identification number (PIN), to obtain goods or services from a merchant or for any other transaction with a merchant that requires a PIN.

(B) You may not withdraw more than $500.00 per day using one or more ATMs.

(C) You may not withdraw cash more than 5 times per day from one or more ATMs.

(D) Card transactions may be made only during the Draw Period and before the expiration date stated on the Card, and authorized by us using the Card authorization network during the Draw Period.

We are not obligated to make a loan to you to pay a transaction in violation of one of these limitations.



[redacted]

**AGREEMENT AND DISCLOSURE STATEMENT**

**5. Establishing a New Fixed Rate Part.** During the Draw Period, you may transfer all or a portion of the principal balance in the Variable Rate Part to a new Fixed Rate Part.

**(a) Request for a Transfer.** You may request a transfer to a Fixed Rate Part by completing and signing a Balance Transfer Request form, provided by us. Any one Borrower may sign the form. Upon receiving the properly completed form, we will comply with your request or respond to you within a reasonable time, which may not be that same banking day.

**(b) Transfer Fee.** You agree to pay a Transfer Fee, in the amount disclosed on page one, each time you make a transfer to a Fixed Rate Part. The Transfer Fee is a *FINANCE CHARGE*.

**(c) Term of a Fixed Rate Part.**

(i) When you request a transfer to a Fixed Rate Part, you must specify on the Balance Transfer Request form the length of the repayment term of the Fixed Rate Part. The term must be stated in full months; transfers involving partial months are not permitted. The term may not be less than 60 months and not more than 360 months.

(ii) The first payment on the Fixed Rate Part will be due approximately 25 days after the last day of the Billing Cycle in which the transfer is made.

**(d) Payment Amount.**

(i) The scheduled payments for a Fixed Rate Part will be calculated so that equal payments of principal and interest will pay the Fixed Rate Part in full by the end of the term of the Fixed Rate Part, if all payments are made on or before the Payment Due Dates.

**(e) Limitations on Transfers.**

(i) Transfers to a Fixed Rate Part must be in amounts not less than $5,000.00 each.

(ii) You may not transfer balances from a Fixed Rate Part to another Fixed Rate Part.

(iii) You may not transfer any additional balance to a Fixed Rate Part after it has been established by the initial transfer.

(iv) Transfers may be made only during the Draw Period, and only during periods when the Account has not been Terminated or Suspended.

(v) You may not make a transfer to a Fixed Rate Part during any Billing Cycle in which there was a balance on more than five Fixed Rate Parts during that Billing Cycle, except that if you made a transfer to a Fixed Rate Part at the time you opened this Account, then you may not make a transfer to a Fixed Rate Part during any Billing Cycle in which there was a balance on more than six Fixed Rate Parts during that Billing Cycle so long as there remains a balance outstanding on the Fixed Rate Part established at Account Opening.

**6. Security Interest.**

**(a)** You and any other owners of the Mortgaged Premises have executed a Mortgage to secure the payment of all money due under this Agreement, including future advances. The rights and duties of you and any other owners and of us are set forth in this Agreement and in the Mortgage. We waive our security in the Mortgaged Premises as to any extension of credit to the extent that it would cause the outstanding principal balance to exceed the Maximum Credit Limit.

**(b)** You also give us a security interest in the proceeds and returned premiums of any property and, if applicable, flood insurance covering the Mortgaged Premises.

**(c)** Collateral securing other obligations to us may also secure this Account.

**7. Finance Charge due to the application of the Periodic Rate ("interest").** At all times that this Account is in effect, including the Draw Period and the Repayment Period and any period after Termination in which there remains an outstanding balance on this Account, interest will be calculated as of the last day in the Billing Cycle in the following way:

**(a) When the Interest Begins.** Interest begins to accrue on the day each loan and each transfer is posted to this Account. There is no time during which credit is extended that you do not incur interest.

**(b) How We Determine the Balance on Which Interest is Computed.** For each part of the Account, we compute interest on the "Daily Balance" (including current transactions) on that part during the Billing Cycle. To get the Daily Balance for each part, we take the beginning balance on that part each day and add any new loans or transfers posted to that part that day; we subtract any payments and credits posted to that part that day; and we then subtract any Late Charges, fees, and unpaid Finance Charges included in the balance for that part. This gives us the "Daily Balance" for the part. We do this to get the Daily Balance for each part, separately.

**(c) How We Compute Interest.** For each part, we will compute interest for the Billing Cycle by adding together the Daily Balance for each day during the Billing Cycle and then multiplying that sum by the Daily Periodic Rate in effect during that Billing Cycle for that part. The result is the interest for that part for that Billing Cycle. We add the interest from each part for that Billing Cycle to get the interest for the Account for that Billing Cycle.

**(d) Daily Periodic Rate and Annual Percentage Rate.** The interest for each part will be computed using the initial Daily Periodic Rate for that part disclosed on page one. This corresponds to the initial *ANNUAL PERCENTAGE RATE* for that part also disclosed on page one. These rates are subject to change each Billing Cycle as described below.

**(e) The Corresponding Annual Percentage Rate** includes only interest and no other charges.

**(f) How We Determine the Rate on the Variable Rate Part.** The Daily Periodic Rate and Corresponding Annual Percentage Rate applicable to the Variable Rate Part may increase or decrease as of the first day of each Billing Cycle. These changes may be the result of a change in the "Index" or a change in your eligibility for an Automatic Payment Plan Discount. Changes in the Corresponding Annual Percentage Rate and in the Daily Periodic Rate may increase the amount of interest you must pay and can change the amount of and number of payments necessary to pay the Variable Rate Part in full.

**(i) Variable Rate Part Index.** The Variable Rate Part Index will be the Latest Prime Rate for the U.S., published in *The Wall Street Journal* ("Latest U.S. Prime Rate") on the last day on which the Latest U.S. Prime Rate is published in the calendar month preceding the first day of the Billing Cycle. If more than one Latest Prime Rate is reported on that day, the highest rate will be used. The Variable Rate Part Index is not necessarily the lowest rate charged by us on our loans.



[redacted]

**(ii) Variable Rate Part Margin.** During Billing Cycles in which no Discounts apply, the Variable Rate Part Margin will be equal to the Variable Rate Part Base Margin stated on page one. If you are eligible for the Automatic Payment Plan Discount during the Billing Cycle, the Variable Rate Part Base Margin(s) will be reduced by the amount of the corresponding Discount shown at the top of page one.

**(iii) Calculation of the Variable Rate Part Corresponding Annual Percentage Rate.** The Variable Rate Part Corresponding Annual Percentage Rate for any Billing Cycle will be the sum of the Variable Rate Part Index plus the Variable Rate Part Margin. *Provided, however*, that the Variable Rate Part Corresponding ***ANNUAL PERCENTAGE RATE*** will never be more than 24% and will never be less than 2.250% (the "floor"). ***This interest rate floor will apply regardless of the Index value or any Discounts applicable to the Margin.***

**(iv) Calculation of the Variable Rate Part Daily Periodic Rate.** The Variable Rate Part Daily Periodic Rate to be used in each Billing Cycle will be determined on the first day of the Billing Cycle by dividing the applicable Variable Rate Part Corresponding Annual Percentage Rate by 365 (or 366 in a leap year).

**(g) How We Determine the Rate on the Fixed Rate Part.** The Fixed Rate Part Daily Periodic Rate and Fixed Rate Part Corresponding Annual Percentage Rate applicable to a new Fixed Rate Part may increase or decrease as of the first day of the Billing Cycle in which the Fixed Rate Part is established. The Daily Periodic Rate and Corresponding Annual Percentage Rate applicable to a Fixed Rate Part will not thereafter change during the term of the Fixed Rate Part.

**(i) Fixed Rate Part Index.** The Fixed Rate Part Index is the Bankrate.com US Home Mortgage 15 Year Fixed National Average APR published on Bloomberg.com under the Quotes section (Ticker ILM1NAVG:IND) on the last day on which that rate is published in the calendar month preceding the first day of the Billing Cycle. The Fixed Rate Part Index is not necessarily the lowest rate charged by us on our loans. NOTE: We add the Fixed Rate Part Margin to this Fixed Rate Part Index, as described below, to calculate the Fixed Rate Part Corresponding Annual Percentage Rate.

**(ii) Fixed Rate Part.**

**(A) Fixed Rate Part Margin.** During Billing Cycles in which no Discounts apply, the Fixed Rate Part Margins will be equal to the Fixed Rate Part Base Margins for the Fixed Rate Part amounts and terms stated in Table 1 at the end of this Agreement. If you are eligible for the Automatic Payment Plan Discount during the Billing Cycle, the Fixed Rate Part Margin(s) will be reduced by the amount of the corresponding Discount shown at the top of page one.

**(B) Calculation of the Fixed Rate Part Corresponding Annual Percentage Rate.** The Fixed Rate Part Corresponding Annual Percentage Rate for any Billing Cycle will be the sum of the Fixed Rate Part Index plus the Fixed Rate Part Margin for the applicable Fixed Rate Part amounts and terms set forth in Table 1 at the end of this Agreement. *Provided, however,* that the Fixed Rate Part Corresponding ***ANNUAL PERCENTAGE RATE*** will never be more than 24% and will never be less than 2.250% (the "floor"). ***This interest rate floor will apply regardless of the Index value or any Discounts applicable to the Margin.***

**(C) Calculation of the Fixed Rate Part Daily Periodic Rate.** The Fixed Rate Part Daily Periodic Rate to be used in each Billing Cycle will be determined on the first day of the Billing Cycle by dividing the applicable Fixed Rate Part Corresponding Annual Percentage Rate by 365 (or 366 in a leap year).

**(h)** If you Close this Account before the end of the Repayment Period, we may calculate the accrued interest up to the date that you Close this Account; we may require you to pay the accrued interest for the partial Billing Cycle along with the other amounts due before we Satisfy the Mortgage of Record.

**(i)** Automatic Payment Plan Discount. There is a discount for enrolling in the Automatic Payment Plan at the time of account opening. The Automatic Payment Plan Discount will not apply if your participation in the Automatic Payment Plan discontinues for any reason, including: (a) if you choose to terminate participation; (b) the checking account identified at the top of page one is closed; or (c) if there are not sufficient funds in the account to make the full monthly payment on any three payment due dates. If you cease to qualify for the Automatic Payment Plan Discount, the Annual Percentage Rate applicable to this Account may increase by the amount of the discount shown at the top of page one, and other terms applicable to this Account may also change, as set forth in this Agreement.

**8. Other *FINANCE CHARGES*.** We will charge you the Other ***FINANCE CHARGES*** listed on page one.

**(a) Transfer Fee.** We will charge you a Transfer Fee of the amount disclosed on page one each time you transfer a balance to a Fixed Rate Part or each time you transfer a balance from a Fixed Rate Part back to the Variable Rate Part. The Transfer Fee is a FINANCE CHARGE applicable to the Variable Rate Part.

**(b) *FINANCE CHARGES*** required to open the Account. If Finance Charges required to open the Account are listed on page one, they must be paid before this Account is opened and may not be paid using loans from this Account.

**9. Other Charges.** Other Charges will be assessed to the Variable Rate Part.

**(a) Closing Costs.** If applicable, we will charge you closing costs of the type and in the amount set forth in the "Closing Costs" paragraph on page one.

**(b) Late Charges.** We will charge you a Late Charge equal to the greater of $40.00 or ten percent (10%) of the payment for each month any Minimum Payment is not made within 15 days of its due date. No Late Charge will be due if the reason the payment is late is either:

(i) attributable to a Late Charge assessed on an earlier payment; or

(ii) because, after default by you, the entire balance on this Account is due.

**(c) Annual Fee.** We will charge you an Annual Fee in an amount and beginning at the time set forth on page one and continuing each year thereafter during the Draw Period on this Account.

**(d) Return Credit Line Check and Overlimit Fee.** We will charge you a fee of $30.00 for each check written on this Account which is properly dishonored by us for any reason. We will charge you an Overlimit Fee of $30.00 for each check written on this Account which is paid by us which causes your outstanding principal balance to exceed your Maximum Credit Limit and for any Choice Access Card transaction or other event which causes your outstanding principal balance to exceed your Maximum Credit



[redacted]

Limit. We will not charge an Overlimit Fee if the balance would not have exceeded your Maximum Credit Limit but for a Card transaction which had been authorized but not yet posted to the Account.

**(e) Stop Payment Fee.** We will charge you a Stop Payment Fee of $20.00 if you request us to stop payment on a check written on this Account. We cannot stop payment on a Choice Access Card transaction after it has been made by you.

**(f) Return Check Fee.** We will charge you a fee of $30.00 if your payment on this Account is made with a check, draft, negotiable order of withdrawal, other similar instrument, or an electronic debit entry (for example, auto pay) is returned to us unpaid for any reason.

**10. Payment Due Date.** The Minimum Payment will be due each Billing Cycle on or before the Payment Due Date stated each month on the Billing Statement. Initially, this will be on or about the day of the month stated on page one, but is subject to change at the option of the Lender. If you have the payment automatically charged to your Checking Account, this will occur on or about the Payment Due Date each month.

**11. Minimum Payment Amount.** The Minimum Payment will be calculated on the last day of each Billing Cycle and will never be greater than the total of the new balances on each part of the Account. The Minimum Payment will be the total of the following amounts:

**(a)** Any past due amounts.

**(b)** The current payment due on the Variable Rate Part, which will never be greater than the new balance on the Variable Rate Part and will be:

(i) During the Draw Period. The current payment due will be the greater of: (i) the sum of the Finance Charge on the Variable Rate Part and other fees, if applicable (but not including Late Charges), which have accrued during the Billing Cycle, plus 1/360 of the principal balance on the Variable Rate Part at the end of the Billing Cycle; or (ii) $25.00.

(ii) During the Repayment Period. Until the Variable Rate Part is paid in full, the current payment due will be the greater of:

(A) the sum of the Finance Charge for the Variable Rate Part and other fees, if applicable (but not including Late Charges), which have accrued during the Billing Cycle, plus the greatest of (i) 1/360 of the principal balance in the Variable Rate Part at the end of the first Billing Cycle in the Repayment Period; or (ii) if one or more Card transactions are posted to the Account during the Repayment Period, 1/yth of the principal balance in the Variable Rate Part at the end of the last Billing Cycle in which a Card transaction was posted, where y equals the number of months remaining in the Repayment Period at the end of the last Billing Cycle in which a Card transaction was posted; or

(B) $25.00.

**(c)** The total of the current payments due on any Fixed Rate Parts will be the lesser of the new balance on the Fixed Rate Part or the scheduled payment on the Fixed Rate Part. Except that, on the due date of the final scheduled payment of a Fixed Rate Part, the total outstanding new balance of that Fixed Rate Part will be due, including all unpaid principal and Finance Charges. See the section called "Establishing a New Fixed Rate Part" to find out how the amounts of those payments will be calculated.

**12. Payments.**

**(a) Payment Application.** We will use each payment made by you of an amount equal to or less than the Minimum Payment in any month first to pay the billed interest on all parts, in any order we choose; then to pay Late Charges, if any; then to pay any other fees and charges, in any order we choose; then to pay amounts incurred to protect the security of the Mortgage; then to pay billed principal, starting with the Fixed Rate Parts, in the order in which they were established, and then the Variable Rate Part; any remaining unapplied payment will be treated as a prepayment. If any principal in a part is not secured by the Mortgage, that amount shall be deemed paid before any other principal in that part that is secured by the Mortgage.

**(b) Crediting of Payments.** A nonconforming payment, if accepted by us, will be credited to your Account not more than 5 days after the date we receive it, unless otherwise required by law. A nonconforming payment is a payment that is not made in accordance with the reasonable requirements stated on your monthly statement in the section called "Crediting of Payments."

**(c) Credit Available for New Loans.** In calculating the principal balance for the purpose of determining the amount of the Maximum Credit Limit that is available for new loans, we may delay crediting payments for a reasonable time for checks and other payment methods to be collected from the drawee (to clear).

**13. Prepayment.**

**(a)** If you pay an amount greater than the Minimum Payment which has been billed (the amount in excess of the Minimum Payment is called a "prepayment"), this will not affect the way we calculate the Minimum Payment in the next Billing Cycle. YOU MAY MAKE PREPAYMENTS IN ANY AMOUNTS AND MAY PAY THE ENTIRE BALANCE AT ANY TIME PROVIDED THAT YOU PAY AT LEAST THE MINIMUM PAYMENT EACH MONTH WHEN IT IS DUE. If you prepay in part, unless you and we agree in writing to apply the prepayment in a different order, we will apply any prepayment to repay the principal balance, starting with the Variable Rate Part, and then starting with the Fixed Rate Part with the highest interest rate; however, if the prepayment pays the principal balance in a Fixed Rate Part in full, we may apply any remaining prepayment to pay the unbilled interest in that Fixed Rate Part, before applying any of the prepayment to pay any other part. For the purposes of determining your rights under the Special Rule for Choice Access Card Purchases mentioned in the Notice of Your Billing Rights, we will apply your payments as required by law, which may be different than the method described above.

**(b) Reimbursement of Closing Costs Including, if Applicable, Taxes.** The amendment to this Agreement in which you have agreed to reimburse us for certain closing costs including, if applicable, taxes, signed by you in connection with this Agreement, is incorporated herein by reference.

**14. Minimum Payment After Termination.** If this Account is Terminated during the Draw Period in accordance with the "Termination of Account Upon Default" paragraph, for the purposes of calculating the Minimum Payment, the Billing Cycle in which the Termination occurs shall be considered to be a Billing Cycle during the Draw Period and all subsequent cycles shall be considered to be cycles during the Repayment Period. If this Account is Terminated during the Repayment Period, the Billing Cycle in which the



[redacted]

**AGREEMENT AND DISCLOSURE STATEMENT**

Termination occurs and all subsequent cycles shall be considered to be Billing Cycles during the Repayment Period. After Termination, the Minimum Payments shall be calculated in accordance with this paragraph and the paragraph called "Minimum Payment Amount," unless we exercise our rights under the "Acceleration of the Outstanding Balance."

**15. Required Insurance.** We require you to obtain and keep in force property insurance on the Mortgaged Premises and to provide evidence of insurance to us. To the extent permitted by applicable law, insurance must cover loss of or damage to the Mortgaged Premises and must be in such an amount as is sufficient to protect our interest. If flood insurance is required by federal law, you agree to obtain and keep in force insurance in the amount required by law. YOU MAY OBTAIN THESE INSURANCE COVERAGES FROM ANY PERSON OF YOUR CHOICE. Your choice is subject to our reasonable approval. All policies must name us as a loss payee/mortgagee in a form acceptable to us and provide for at least 10 days' notice to us of reduction in coverage or cancellation.

**16. We May Purchase Insurance If You Don't.** If you fail to keep in force property insurance and/or, if applicable, flood insurance and/or fail to provide evidence of such insurance to us, we may notify you that you should purchase the required insurance at your expense. If you fail to purchase the insurance within the time stated in the notice and/or fail to provide us with evidence of such insurance, we may purchase insurance to protect our interest, to the extent permitted by applicable law and charge you the cost of the premiums and any other amounts we incur in purchasing the insurance. THE INSURANCE WE PURCHASE WILL BE SIGNIFICANTLY MORE EXPENSIVE AND MAY PROVIDE YOU LESS COVERAGE THAN INSURANCE YOU COULD PURCHASE YOURSELF. At our option, we may treat these premiums and fees as an extension of credit from this Account on which interest will accrue or as amounts incurred to protect the security of the Mortgage. To the extent permitted by applicable law, Lender may receive reasonable compensation for obtaining the required insurance on Borrower's behalf. In certain states, the required insurance may be obtained through a licensed insurance agency affiliated with Lender. This agency will receive a fee for providing the required insurance. In addition, an affiliate may be responsible for some or all of the underlying insurance risks and may receive compensation for assuming such risks. If additional information is required concerning insurance or our affiliate arrangements, please contact us at:

PNC Bank, National Association
ISAOA ATIMA
P.O. Box 7433
Springfield, OH 45501

**17. You Agree:**

**(a)** Not to request transfers for less than $5,000.00.

**(b)** To repay all amounts advanced hereunder together with interest, as provided in this Agreement. You also agree to pay any other amounts which become due hereunder. These include, as applicable, other Finance Charges which you will pay when you open this Account, Transfer Fees, any amounts you may owe because of an unauthorized use of your Choice Access Card, Other Charges, any amounts advanced to protect the security of the Mortgage or for insurance, and Costs of Collection.

**(c)** To pay at least the Minimum Payment each month on or before the Payment Due Date.

**(d)** To immediately pay any Late Charge assessed.

**(e)** Not to make loans from this Account which will cause the principal balance in this Account at any time to exceed the Maximum Credit which we have now approved or may approve at any time in the future.

**(f)** To immediately pay any portion of the principal balance in excess of the Maximum Credit.

**(g)** To give us such personal financial statements as we may request from time to time.

**(h)** Not to give us false information or signatures at any time or let anyone who is not a Borrower use the Account.

**(i)** To perform all obligations under any mortgage or security agreement which has priority over the Mortgage and to pay all taxes, charges or assessments which might have priority over the Mortgage.

**(j)** That you own the Mortgaged Premises and that they are unencumbered except for encumbrances of record as of the date of this Agreement.

**(k)** That you will notify us immediately in writing if you change your residence or mailing address.

**(l)** If the Mortgaged Premises are part of a condominium or a planned unit development, to comply with all by-laws, regulations or restrictions of record.

**(m)** To keep the Mortgaged Premises insured as provided in this Agreement.

**(n)** Not to transfer title to the Mortgaged Premises (except as provided by federal law).

**(o)** To keep the Mortgaged Premises in good order and repair.

**(p)** To permit our agents to inspect the Mortgaged Premises from time to time after reasonable notice.

**(q)** To make all payments by check, money order, or other legal instrument in U.S. Dollars, so that we receive it at the remittance address disclosed on the monthly statement. Any subsidiary or affiliate of ours may act as your agent in receiving payments on this account.

**(r)** To give us a Mortgage on the Mortgaged Premises, which Mortgage is in the proper form so that it can be recorded in the office of the Recorder of Deeds or other appropriate office in the County where the Mortgaged Premises is located. You agree to fully cooperate with us to correct any clerical errors and, if we reasonably ask you, to sign a corrective mortgage or a new mortgage if the original is lost, destroyed, damaged, contains errors, or for any reason it cannot be recorded.

**(s)** To notify us if your Card or special checks are lost or stolen, in accordance with the paragraph called "Lost and Stolen Choice Access Cards and Checks" or if you think someone has used your Card or Account without your permission. You agree to assist us in any way we may reasonably request to find out what has happened and with any investigation and prosecution concerning unauthorized charges to this Account, including answering questions verbally and in writing.

**(t)** To return to us the Choice Access Card, the checks and any other devices we provided to you to obtain advances of credit, if your right to obtain further advances of credit has been Terminated, Suspended or are prohibited.

*ALL OF THE ABOVE PROMISES ARE MATERIAL OBLIGATIONS UNDER THIS AGREEMENT.*

**18. Lost and Stolen Choice Access Cards and Checks.**



[redacted]

**AGREEMENT AND DISCLOSURE STATEMENT**

**(a) Notify us immediately.** If your special checks for this Account are lost or stolen, or if you think someone is using your Account without your permission, notify us immediately, in writing to:
PNC Bank
B6-YM07-01-7
P.O. Box 8727
Dayton, OH 45401-8727
If your Card is lost or stolen, or if you think someone is using your Card without your permission, notify us immediately by calling us at 1-888-762-2265 or in writing to:
PNC Bank
B6-YM07-01-7
P.O. Box 8727
Dayton, OH 45401-8727

**(b) Liability for unauthorized use.** You may be liable for unauthorized use of any Card provided to any Borrower, according to applicable law, but not for more than $50.00. You will not be liable for any unauthorized use of a Card or this Account made after we have been notified of the loss or theft. You should follow the directions in the Notice of Your Billing Rights if you suspect an unauthorized use of a Card or your Account.

**19. Our Liability.** We have no responsibility for failure of any machine, merchant or other party to honor checks, a Choice Access Card or any other means which we may permit from time to time to be used to obtain a loan from this Account.

**20. Possible Actions Which May Be Taken By Lender.** Under the circumstances described below, Lender can: (1) Terminate the Account; (2) require you to pay the entire outstanding balance on the Account in one payment; (3) refuse to make additional extensions of credit; (4) reduce the Maximum Credit Limit; (5) refuse to allow you to establish any new Fixed Rate Parts; and/or (6) make specific changes that are set forth in this Agreement.

**(a) Termination of Account Upon Default.** You will be in default and this Account will Terminate, effective immediately, upon our mailing a Notice of Termination to you if:

(i) You commit fraud or make a material misrepresentation in connection with this Account.

(ii) You fail to meet any of the repayment terms of this Agreement.

(iii) Any of your actions or your failure to act adversely affects our security for this Account, or any of our rights in such security; for example, and not by way of limitation, if you transfer title to the Mortgaged Premises, or the sole owner of the Mortgaged Premises who is obligated on this Account dies.

**(b) Acceleration of the Outstanding Balance.**

(i) Unless prohibited by law, if this Account is Terminated by default, we may, at our option, after any notice required by law and the expiration of any time required by law during which you may cure a default, declare due and payable the entire outstanding balance on this Account. If this happens, you will be required to pay the outstanding balance on this Account in one payment at that time. If you are in default under the previous paragraph titled "Termination of Account Upon Default," during the Repayment Period or during a time when this Account is already Terminated, we may after any notice required by law and the expiration of any time required by law during which you may cure a default, declare due and payable the entire balance owing on this Account. If we declare the entire balance due and payable, we can bring suit for the amounts due, foreclose the Mortgage, or take other action as permitted or provided by law to collect the balance owing.

(ii) If you are or become in the future an executive officer with respect to whom federal law requires that all credit granted by us be due and payable on demand, then, during such times as federal law so requires, all credit granted under this Account shall be due and payable on demand.

**(c) Suspension of Credit Privileges or Reduction of Maximum Credit.** If any of the conditions listed in this paragraph occurs, we may, by mailing a notice of our action, temporarily suspend your ability to obtain loans from this Account or establish new Fixed Rate Parts and/or reduce the Maximum Credit applicable to this Account. If, under the conditions described in the notice, the circumstances upon which the prohibition of additional extensions of credit or the reduction of the Maximum Credit were based shall cease to exist, we shall again be obligated to permit extensions of credit on this Account and to restore the Maximum Credit. The obligation shall commence after we receive and investigate a written request from you accompanied by evidence satisfactory to us that the condition which gave rise to the prohibition no longer exits. Unless prohibited by law, you shall pay the expense of obtaining any documentation we require in connection with your request.

(i) The value of the Mortgaged Premises has declined significantly below its appraised value for the purposes of this Account.

(ii) We reasonably believe that you will be unable to fulfill the repayment obligations under this Agreement because of a material change in your financial circumstances.

(iii) You file or are placed in bankruptcy.

(iv) You are in default of any Material Obligation set forth in the paragraph called "You Agree."

(v) You do one of the things listed in subparagraph (a) of this paragraph, which could cause this Account to Terminate. We may later Terminate this Account at any time during which the reason for Termination continues to exist.

**(d) Prohibition of Additional Extensions of Credit and Reduction of the Maximum Credit, Additional Circumstances.** We may also temporarily Suspend your ability to obtain loans from this Account or establish new Fixed Rate Parts and/or reduce your Maximum Credit if any of the conditions listed in this paragraph shall occur. We will give you notice of our action. If the circumstances later change so that the condition no longer exists, we shall again be obligated to allow extensions of credit, transfers to Fixed Rate Parts and to restore your Maximum Credit. We will give you notice that the credit is again available.

(i) The priority of our security interest is adversely affected by government action to the extent that the value of our security interest is less than 120% of your Maximum Credit.

(ii) We are notified by our regulatory agency that continued advances constitute an unsafe or unsound practice.



[redacted]

**AGREEMENT AND DISCLOSURE STATEMENT**

(iii) We are precluded by government action from imposing the Annual Percentage Rate provided in this Agreement.

(iv) The Latest U.S. Prime Rate published in *The Wall Street Journal* on the last day of any calendar month plus the Variable Rate Part Base Margin is more than 24%.

(v) We may temporarily Suspend your ability to establish new Fixed Rate Parts if, for any Fixed Rate Part the Fixed Rate Index plus the Fixed Rate Part Base Margin for the amount and term chosen is more than 24%.

**21. Prohibition of Additional Extensions of Credit at Your Request.** Any of you may direct us to prohibit further extensions of credit on this Account. A notice by any one of you that you do not intend to be obligated for additional loans on this Account shall be considered a request to prohibit further extensions of credit on this Account by all of you. The prohibition shall become effective as soon as we can reasonably act to stop new loans from being made. A prohibition of further extensions of credit, under this paragraph, will also prohibit transfers to a Fixed Rate Part. All of you who are obligated on this Account must request in writing reinstatement of this Account for the request to be effective.

**22. Limitation of Indebtedness at Your Request.**

If you deliver to us a written notice requesting that the indebtedness on this Account be limited, our obligation to make further loans from this Account or transfers to a Fixed Rate Part shall be terminated or amended, as provided by applicable law in the state where the Mortgaged Premises is located. You agree to send the notice to us at:

PNC BANK
6750 MILLER RD
BRECKSVILLE, OH 44141

**23. Costs of Collection.** If we require you to pay immediately in full as described above, we will have the right to be paid back by you for all of our costs and expenses in enforcing this Agreement to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**24. Changes to Your Account.** We may make the following changes to this Account:

**(a)** We may change the Index and margin applicable to the Variable Rate Part and/or applicable to new Fixed Rate Parts, if the Index is no longer available. If we do so, we will choose an index with a historical movement substantially similar to the movement of the original Index and we will choose a new margin so that the new index and new margin will result in an Annual Percentage Rate substantially similar to the rate in effect at the time the original Index became unavailable.

**(b)** We may make any change to which the Borrower specifically agrees in writing.

**(c)** We may make a change that will unequivocally benefit you during the remaining term of this Account.

**(d)** We may make a change which is insignificant under applicable federal law.

**(e)** We may make certain changes set forth in this Agreement, upon the happening of certain specified events. For example, if you are eligible for the Automatic Payment Plan Discount when you open your Account, and then cease to be eligible for the benefit, the Annual Percentage Rates on your Account may increase.

**(f)** If required by applicable law, we will mail you a written notice prior to the effective date of any change, in accordance with that law, of any changes made to this Account. Changes will apply to outstanding balances and new loans except as otherwise stated in the notice.

**25. Monthly Statements.** We will send you a monthly statement for each Billing Cycle in which:

**(a)** activity is posted to your Account; or

**(b)** we impose a Finance Charge to your Account; or

**(c)** there is a debit or credit balance of more than $1.00 in your Account.

The statement will show advances made, the amount due, Finance Charge, payments made and the balance which you owe. Unless you notify us in writing of errors in the statement within 60 days from the date it is mailed, the statement shall be considered correct and accepted by you. We need not mail you a statement if we deem this Account uncollectible or if delinquency collection proceedings have been started by us. If there is more than one Borrower, each agrees that if the statement is sent to and accepted by any of you it shall be considered correct as to and accepted by all of you. If there is more than one Borrower, we will mail the statement to the first Borrower identified on page one.

**26. Checks on Your Account.** We shall retain all checks drawn on your Account and paid.

**27. Postdated and Stale Dated Checks.** Procedures and laws applicable to postdated, and stale dated checks in connection with transactions on regular checking Accounts shall apply to checks under this Agreement. You agree not to issue postdated checks.

**28. Stop Payment.** Procedures and laws applicable to stop payment of checks in connection with transactions on regular checking accounts shall apply to checks under this Agreement. Stop Payment orders are subject to the fee disclosed in the "Other Charges" section of this Agreement. You may place a stop payment order at any branch office, or by calling us or writing us at the following address:

PNC (B6-YM07-01-1)
P.O. Box 1820
Dayton, OH 45401-1820

We cannot stop payment on a Choice Access Card transaction. If you have a dispute with a merchant concerning a Card transaction, see the paragraph called "Special Rule for Choice Access Card Purchases" which is part of the Notice of Your Billing Rights.

**29. Communications Concerning Disputed Debts.**

**ALL COMMUNICATIONS BY YOU TO US CONCERNING DISPUTED DEBTS, INCLUDING AN INSTRUMENT TENDERED AS FULL SATISFACTION OF THE ACCOUNT, SHOULD BE SENT TO:**

PNC BANK
P.O. BOX 1820
DAYTON, OH 45404-1820

**30. Notices.** We will send notices to you to your last known address in our files. Notices sent to that address will be effective for all



[redacted]

purposes under this Agreement. We will send them by regular mail unless applicable law requires us to use certified or registered mail. Unless applicable law requires otherwise, a notice sent to any of you shall be considered sent to all of you, and a notice received by any one of you shall be considered received by all of you.

**31. Tax Deductibility.** You should consult a tax advisor regarding the deductibility of interest and charges for this Account.

**32. Credit Reports. YOU AUTHORIZE US TO OBTAIN CREDIT REPORTS ON YOU FROM TIME TO TIME AT OUR DISCRETION WHILE YOU HAVE AN ACCOUNT WITH US.**

**NOTICE TO ALL BORROWERS. We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report. If you believe that we have information about you that is inaccurate or that we have reported or may report to a consumer (credit) reporting agency information about you that is inaccurate, you should notify us of the specific information that you believe is inaccurate by writing to us at:**

PNC Credit Dispute Investigations
P.O. Box 8703
Dayton, OH 45401-8703

**33. Important Information about Phone Calls, Texts, Prerecorded and Email Messages.** If, at any time, you provide to PNC Bank, National Association, its affiliates or designees contact numbers that are wireless telephone number(s) including, but not limited to, cell or VoIP numbers, you are consenting to PNC Bank, National Association using an automated dialing system to call or text you, or to send prerecorded messages to you, in order to service, and collect on, any personal account(s) and business account(s) (for which you are an authorized signer or designated contact person) with PNC Bank, National Association, but not to market to you. For any type of phone call with PNC Bank, National Association, you consent that the call may be monitored or recorded for quality control and training purposes. By providing your email address, you consent to receive electronic mail from PNC Bank, National Association.

**34. Electronic Records, Electronic Signatures, Images and Counterparts.** Notwithstanding any other provision of this Agreement, including without limitation a provision requiring a "writing," this Agreement, any Mortgage or any other document related to the Account or the Card, and any amendment or modification to any of the foregoing, may in our sole and absolute discretion be presented, delivered and/or executed in as many counterparts as necessary or convenient, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically. All such counterparts shall constitute one and the same document. We may, in our discretion, convert or copy a manually signed paper counterpart into electronic form (such as scanned into PDF format or transmitted via facsimile), or (b) convert or copy an electronically signed counterpart into another electronic format or image, or into a tangible paper counterpart, for transmission, delivery, retention, recording and/or enforcement. Each counterpart, whether in its original form or in a converted or copied form, shall be deemed an original for all purposes.

**35. Remedies Cumulative.** If any circumstance exists which would permit us to temporarily prohibit further extensions of credit on this Account or reduce the credit limit or terminate this Account and accelerate the balance: (a) we may take such action at any time during which such circumstance continues to exist; and (b) our remedies under this Agreement shall be cumulative and not alternative.

**36. Delay in Enforcement.** We can delay in enforcing any of our rights under this Agreement without losing them. Any waiver by us of any provision of this Agreement will not be a waiver of the same or any other provision on any other occasion.

**37. Assignment.** You may not assign or otherwise transfer your rights and privileges under this Agreement, or delegate your obligations to repay amounts you owe us. Any attempt to assign or delegate will be void and of no effect. We may assign any and all of our rights under this Agreement at any time without your consent. A person(s) to whom we assign this Agreement shall be entitled to all of our rights under this Agreement. None of your rights or obligations shall be affected by such assignment.

**38. Severability.** If any provision of this Agreement is held to be invalid or unenforceable, such determination shall not affect the validity or enforceability of the remaining provisions of this Agreement.

**39. Waiver.** Borrower(s) and any person who has obligations under this Agreement waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**40. Your Responsibilities.** If more than one of you has signed this Agreement, all of you are equally responsible, individually and together, to us for payment in full of this Account and performance of all obligations under this Agreement.

**41. Governing Law and Construction.** This Agreement has been accepted by us in Delaware and all loans shall be extended by us to you in Delaware. Regardless of the state of your residence or the place to which you submitted an application, you agree that the provisions of this Agreement relating to interest, charges and fees shall be governed by and construed in accordance with federal law and, as made applicable by federal law, Delaware law. Unless preempted by federal law, other substantive terms and provisions shall be governed by and construed in accordance with the laws of Delaware; procedural matters relating to the enforcement of the obligations stated in this Agreement and matters relating to the granting, perfection and enforcement of the security interest securing this Agreement shall be governed by the laws of the state where enforcement, granting or perfection takes place.



[redacted]

**Choice Home Equity Line of Credit - Principal and Interest** PNC BANK

**Borrower:** HYUN WOOK LEE
**Lender:** PNC Bank, National Association ("PNC Bank, N.A.")
**Date of this Agreement:** May 17, 2022

## AGREEMENT AND DISCLOSURE STATEMENT

**Agreement Index.** This Index is for convenience and reference. It shall not limit the meaning or scope of any paragraph or section. "BR" refers to the Billing Rights notice on page 12. "H" refers to the Header at the top of page one. The numbers alone refer to paragraphs of this Agreement.


| | | | | | |
|---|---|---|---|---|---|
| Acceleration of the Outstanding Balance | 20 | Finance Charges | H,7,8 | Prepayment | 13 |
| Agreement | 1 | Fixed Rate Parts | 1,5 | Pricing Tables | 11 |
| Annual Fee | H,9 | Flood Insurance | 15 | Property Insurance | 15 |
| Annual Percentage Rate | H,7 | General Description of Account | 2 | Questions About Your Bill | BR |
| Assignment | 36 | Governing Law | 41 | Reduction of Maximum Credit Limit | 20,21,22 |
| Attorney's Fees | 23 | Index | 7 | Regular Account | H,1 |
| Automatic Payment Plan | H,1 | Introductory Period | 1,7 | Remedies | 34 |
| Base Margin | H | Late Charges | 9 | Repayment Period | 1,3 |
| Billing Cycle | 1 | Legal Fees | 23 | Required Insurance | 15 |
| Billing Errors | BR | Lender | H,1 | Return Check Fee | 9 |
| Billing Statement | 25 | Lender's Liability | 19 | Return Credit Line Check Fee | 9 |
| Borrower's Responsibilities | 17,39 | Loans | 4 | Satisfy the Mortgage | 1,10 |
| Borrower's Right to Suspend Credit | 21,22 | Lost Card or Check | 18 | Security Interest | 6 |
| Card | 1,4 | Margin | H,7 | Severability | 37 |
| Changes to your Account | 24 | Material Obligations of Borrower | 17 | Stale Dated Checks | 27 |
| Checks | 4,26,27 | Maximum Credit Limit | H,1 | Stolen Card or Checks | 18 |
| Choice Access Card | 1,4 | Minimum Payment | 11,14 | Stop Payment | 28 |
| Close this Account | 1,9 | Mortgage | 1,6 | Stop Payment Fee | 9 |
| Closing Costs | H,9 | Mortgaged Property | 1,6 | Suspension of Credit Privileges | 1,20,21,22 |
| Collateral | 6 | Monthly Statements | 25 | Tax Deductibility | 31 |
| Costs of Collection | 23 | Notices | 30 | Telephone Calls | 33 |
| Court Costs | 23 | Other Charges | 9 | Term of a Fixed Rate Part | 3,5 |
| Credit Available | H,1,4,12 | Other Finance Charges | 8 | Termination of Account | 1,14,20 |
| Credit Reports | 32 | Our Agreement to Make Loans | 4 | Transfer Fee | H,5,8 |
| Crediting of Payments | 12 | Overlimit Fee | 9 | Transfer to Fixed Rate Part | 4,5 |
| Daily Balance | 7 | Paid in Full Checks | 29 | Unauthorized Use | 18 |
| Daily Periodic Rate | H,7 | Parts of the Account | 1 | Variable Rate | 7 |
| Default | 20 | Payment Application | 12,13 | Variable Rate Part | 1 |
| Definitions | 1 | Payment Due Date | H,1,10 | Waiver | 35,38 |
| Delay in Enforcement | 35 | Payment Options | H,11 | We May Purchase Insurance If You Don't | 16 |
| Disputed Debts | BR,29 | Payments | 10,11,12 | Writing Checks | 2,4 |
| | | Periodic Credit Review | 32 | | |
| | | Postdated Checks | 27 | | |


The Base Margins shown below do not include the Automatic Payment Plan Discount; the APRs and DPRs shown below do reflect the Automatic Payment Plan Discount: 0.250 percentage points off Base Margin.

**TABLE 1 - FIXED RATE P&I PART - Initial Daily Periodic Rates, Initial Corresponding Annual Percentage Rates, and applicable Base Margins**

| | Principal & Interest Fixed Rate Part | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Rate Part Term | 60-72 months | | | 73-144 months | | | 145-216 months | | | 217-264 months | | | 265-360 months | | |
| Fixed Rate Part Amount | Base Margin | APR | DPR | Base Margin | APR | DPR | Base Margin | APR | DPR | Base Margin | APR | DPR | Base Margin | APR | DPR |
| $5,000 to $24,999 | 4.740 | 9.150 | 0.0251 | 4.940 | 9.350 | 0.0256 | 5.140 | 9.550 | 0.0263 | 5.290 | 9.700 | 0.0266 | 5.540 | 9.950 | 0.0273 |
| $25,000 to $49,999 | 2.290 | 6.700 | 0.0184 | 2.440 | 6.850 | 0.0188 | 2.590 | 7.000 | 0.0192 | 2.790 | 7.200 | 0.0197 | 2.990 | 7.400 | 0.0203 |
| $50,000 | 1.540 | 5.950 | 0.0163 | 1.690 | 6.100 | 0.0167 | 1.890 | 6.300 | 0.0173 | 2.040 | 6.450 | 0.0177 | 2.240 | 6.650 | 0.0182 |

EACH OF YOU ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT AND BY SIGNING THIS AGREEMENT INDICATES YOUR INTENTION TO BE LEGALLY BOUND BY THIS AGREEMENT, INCLUDING THE PARAGRAPHS ON ALL PAGES OF THIS AGREEMENT.

05/17/2022

BORROWER - HYUN WOOK LEE - DATE -



[redacted]

**Choice Home Equity Line of Credit - Principal and Interest**

PNC BANK

**Borrower:** HYUN WOOK LEE
**Lender:** PNC Bank, National Association ("PNC Bank, N.A.")
**Date of this Agreement:** May 17, 2022

**AGREEMENT AND DISCLOSURE STATEMENT**

**Your Billing Rights - Keep This Notice for Future Use**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.
*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a check transaction on your bill, write us on a separate sheet of paper at:
PNC BANK
P.O. Box 8807
Dayton, OH 45401-8807

If your question is about a Choice Access Card transaction, write us on a separate sheet of paper at:
PNC BANK
B6-YM07-01-7
P.O. Box 1820
Dayton, OH 45401-1820

Write us as soon as possible. We must hear from you no later than 60 days after we send you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information describe the item you are unsure about.

If you have authorized us to pay your Account automatically from your checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us within three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then.
Within 90 days, we must either correct the error or explain why we believe the bill was correct.
After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your maximum credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.
If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.
If you fail to pay the amount we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report to that you have a question about your bill. And, we must tell you the name of anyone we report to. We must tell anyone we report to that the matter has been settled between us when it finally is.
If we don't follow these rules, we can't collect the first $50.00 of the questioned amount, even if your bill was correct.

If you have a problem with the quality of goods or services that you purchased with a Choice Access Card and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services.
There are two limitations on this right:
(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.
These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.



[redacted]

# CHOICE HOME EQUITY LINE OF CREDIT

PNC BANK

# REIMBURSEMENT OF CLOSING COSTS AMENDMENT

Borrower: HYUN WOOK LEE

Lender: PNC Bank, National Association

Date: 05/17/2022

This Amendment supplements and amends the Choice Home Equity Line of Credit Agreement ("Agreement") that governs your home equity line of credit Account. In opening the Account, we have agreed to pay certain closing costs to third parties that you would otherwise be required to pay. These costs are itemized below. We have agreed to pay these closing costs on your behalf provided you keep the Account open for a period of at least 36 months.

If you terminate or cancel the Account during the first 36 months as measured from the date shown at the top of page 1 of your Agreement, you agree to reimburse us a pro rata portion of the total Reimbursement Amount Shown below. You terminate the Account when you or someone on your behalf requests us to do so and sends us a payment for the outstanding balance in full. While your Account remains open, the total Reimbursement Amount will decrease by 1/36 each month after the close of each billing cycle. The Reimbursement Amount will reduce to zero after the close of the 36th billing cycle.

If you owe a Reimbursement Amount as calculated in this Amendment, the Reimbursement Amount will be added to your outstanding balance as of the date you request that the Account be terminated, and will be treated as a fee charged to your Account on that day. We will have no obligation to satisfy the mortgage or deed of trust that secures this Account if we do not receive the full final payment, including the portion related to the Reimbursement Amount.

Closing costs subject to reimbursement:

| | | |
|---|---|---|
| State Tax/Stamps Mortgage | $150.00 | |
| | Total Reimbursement Amount | $150.00 |

Your payments will be applied as set forth in your Agreement. In the event your final payment includes a Reimbursement Amount, we will apply the portion applicable to the Reimbursement Amount last, after all other amounts then due have been paid in the order set forth in your Agreement.

Unless otherwise specified, all capitalized terms in this Amendment have the same meaning as set forth in the Agreement. Except as amended here, your Agreement continues to govern the terms of the Account in all other respects.

**EACH BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AMENDMENT AND BY SIGNING BELOW INDICATES BORROWER'S INTENTION TO BE LEGALLY BOUND BY THIS AMENDMENT.**

[signature] 05/17/2022

- BORROWER - HYUN WOOK LEE - DATE -



[redacted]

DEED B: 60047 P: 006
06/28/2022 06:40 PM Pgs: 8 Fees: $175.00
ITax: $150.00
Tiana P Garner, Clerk of Superior Court
Gwinnett County, GA

ERECORDED
eFile Participant IDs: 6939555467,7067927936

WHEN RECORDED MAIL TO:
PNC Bank, N.A.
ATTENTION: Post Closing/Final Documentation
P. O. Box 8800
Dayton, OH 45401-8800

65 LEE 5
38 [redacted]
DOT/MTG-RECORDED
[redacted]

PREPARED BY:
Terrilyn Hardaway
PNC Bank, N.A.
P. O. Box 8800
Dayton, OH 45401-8800

[SPACE ABOVE FOR RECORDERS USE]

# SECURITY DEED

LEE
[redacted]

THIS INDENTURE, made the 17th day of May in the year 2022, between: HYUN WOOK LEE, Married Man; with a mailing address of 2978 WOODWARD DOWN TRL, BUFORD, GA 30519 as party or parties of the first part, hereinafter called Grantor(s), "we" or "us" and PNC Bank, National Association ("PNC Bank, N.A.") 222 Delaware Avenue, Wilmington, DE 19801 as party of the second part, hereinafter called Grantee or "you".

PREMISES: In consideration of the loan hereinafter described, we hereby mortgage, grant and convey to you the premises located at: 2978 WOODWARD DOWN TRL (Street), BUFORD (Municipality), Gwinnett (County) GA (State) 30519 (Zip) (the "Premises") and further described as:
See Attached Exhibit A

WITNESSETH, that Grantor, for and in consideration of the sum of Fifty Thousand And 00/100 DOLLARS ($50,000.00), in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee, its successors and assigns, the above described property, inclusive of all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from the Grantor's ownership, use or possessions of the Premises and all appurtenances thereto, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters.

TO HAVE AND TO HOLD the said bargained Premises with all and singular the rights, member and appurtenances thereto appertaining, to the proper use, benefit and behalf of Grantee, its successors and assigns, in fee simple; and Grantor, will warrant and forever defend the right and title to the above-described Premises unto the said Grantee, its successors and assigns, against the claims of all persons whomsoever,


[redacted]

[redacted]

except as may be otherwise expressly stated herein.

This conveyance is made under the existing code of the State of Georgia, and upon payment of the indebtedness due under the Agreement hereby secured and a written agreement to terminate said Agreement as provided under O.C.G.A. Sec. 44-14-3, this Security Deed shall be canceled and surrendered pursuant thereto, the debt hereby secured being that certain Choice Home Equity Line of Credit Agreement and Disclosure Statement ("Agreement") of even date with this deed between Grantor and Grantee herein having a maximum allowed indebtedness amount of Fifty Thousand And 00/100 dollars ($50,000.00) (the "Credit Limit") or so much thereof as may be advanced and readvanced from time to time to Grantor, plus interest and costs, late charges and all other charges related to the Agreement, all repayable with interest in installments as provided in said Agreement with a final maturity date of May 21, 2062, (being the last day of the "Repayment Period" as defined under the Agreement). This instrument not only secures the foregoing described Agreement but also the performance of all of the promises and agreements made under the Agreement and this Security Deed as well as any extensions, renewals of the whole or any part thereof, amendments, supplements and other modifications of the Agreement and/or this Security Deed and the indebtedness due thereunder and any and all other indebtedness now due by Grantor to Grantee or hereafter incurred by Grantor, including, but not limited to all future advances made by Grantee to Grantor under the Agreement or made by Grantee on behalf of the Grantor as permitted under this Security Deed or allowed by law such as payment of taxes, assessments, insurance premiums or costs or expenses required for the preservation of the Premises. All advances or readvances under the Agreement may be made, repaid and remade from time to time in accordance with the terms of the Agreement and subject to the Credit Limit under the Agreement.

It is agreed that the Grantee shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the Agreement secured hereby.

As further security for repayment of the indebtedness under the Agreement herein described, Grantor hereby sells, assigns, sets over and transfers to the Grantee all of the rents which shall hereafter become due or be paid for the use of the above-described Premises, reserving only the right to the Grantor to collect said rents so long as there is no default in the obligations of the Grantor under this deed or in payment of the Agreement hereby secured. In the event of such default in said Agreement or any part thereof, principal or interest, or in the performance of any obligation of the Grantor under this deed, Grantee may enter upon said Premises and collect the rents therefrom and the Grantee is hereby constituted and appointed as Grantor's agent and attorney-in-fact to collect such rents by any appropriate proceedings, and Grantee is authorized to pay a rental or real estate agent a reasonable commission for collecting such rents. The new amount of rent so collected shall be applied towards the Agreement hereby secured.

For so long as the Agreement exists and indebtedness due thereunder, or any performance remains due under the Agreement, the said Grantor hereby covenants:

(i) to pay all taxes and assessments, water charges and sewer rents or charges related to the Premises or that may be liens upon said Premises, as they become due;

(ii) to keep the Improvements on said Premises insured in company or companies acceptable to said Grantee against loss or damage by fire or lightning in the sum of at least an amount adequate to protect Grantee's interest in Grantee's sole discretion with loss, if any, payable to said Grantee, and shall deliver the policies of insurance to the said Grantee naming the Grantee as the mortgagee or loss payee thereunder



[redacted]

[redacted]

together with the agreement of the insurance company involved to notify Grantee in writing at least ten (10) days prior to any intended cancellation or reduction in coverage, for any reason;

(iii) GRANTOR SHALL PROMPTLY DELIVER TO GRANTEE, UPON REQUEST BY GRANTEE, RECEIPT SHOWING PAYMENT IN FULL OF ALL OF THE FOREGOING ITEMS.

(iv) to keep said Premises in as good condition as it is now and to permit Grantee or its agents or designee the right to inspect the Premises at any reasonable time;

(v) shall not commit or suffer any actual or threaten waste to the Premises;

(vi) shall comply with, or cause the Premises to be complied with, all statutes, ordinances, rules, regulations, and directives or any governmental authority relating to the Premises or any part thereof or the use of occupancy of the Premises or any part thereof;

(vii) shall not remove, demolish, or materially alter, without the prior written consent of Grantee, any part of the Premises, including but not limited to, any of the improvements (the costs for such Improvements or repair being the sole obligations and responsibility of Grantor, who shall pay the entire expenses thereof promptly when due);

(viii) shall not create or permit to exist any LIENS or encumbrances on the Premises which are JUNIOR and INFERIOR in terms of priority to the lien created by this instrument;

(ix) shall not grant, bargain, CONVEY, TRANSFER, assign, exchange or sell all or any portion of the Grantor's interest in the Premises prior to the satisfaction, cancellation and release by Grantee of this Security Deed and the Agreement secured hereby; and,

(x) if the Premises is a condominium or a planned unit development or other similar property or Premises having restrictive covenants thereon, to perform all of the obligations imposed under the Grantor and/or against the Premises pursuant to the declaration or covenants creating or governing the condominium or planned unit development or restricted Premises, the by-laws and regulations of the condominium or planned unit development or restricted Premises and constituent or related documents.

Any tax, assessment, premium of insurance, prior security lien payments (if applicable), and/or any costs or expense necessary for the preservation of the Premises, not paid when due by the Grantor or required, may be paid by Grantee repayable to Grantee on demand and shall draw interest from the time of said payment at the interest rate per annum as provided in the Agreement, and shall, with such interest, be covered by the security of this deed. Any payments by Grantee on behalf of Grantee will not cure Grantor's default or failure to perform Grantor's promises or covenants under this Security Deed. Any replacement insurance that Grantee obtains to cover loss or damages to the Premises may be limited to the amount owing under the Agreement plus the amount of any prior liens or prior Security Deed(s), if any. Grantee may file a proof of loss on behalf of Grantor if Grantor fails or refuses to do so and Grantee may also sign Grantor's name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises or any part thereof. If Grantee receives payment of a claim, Grantee will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Agreement.

Failure to perform the foregoing covenants shall be an event of default under the terms of this deed and the above-referenced Agreement. And should the said Grantee receive any money for condemnation or for damages covered by insurance such money shall be applied to the repair or replacement of any improvements upon the Premises without affecting the full lien of this deed unless the damage for which such insurance proceeds are paid and/or received are substantial in nature in which event (and in any event in which damages are received by Grantee for a condemnation) such money may be retained and applied



[redacted]

[redacted]

toward that payment of any amount hereby secured or may be paid over, either wholly or in part, to the said Grantee to enable said Grantor to repair or replace improvements, or for any other purpose, without affecting the lien of this deed for the full amount secured hereby before such damage or such payment took place in Grantee's sole discretion. In regard to the foregoing, Grantor assigns to Grantee all proceeds or any award or claim for damages, direct or consequential with condemnation or other taking of the Premises or any part of it, or for conveyance in lieu of condemnation, all of which shall be paid to Grantee, subject to the terms of any prior Security Deed (if any).

Grantor agrees to sign or cooperate in the signing and/or filing of public record or otherwise of any document(s) and, at Grantor's expense, to do whatever Grantee believes is necessary to perfect and continue the perfection of the Grantee's lien and security interest in the Premises.

To the extent permitted by applicable law, Grantor waives and releases any error or defects in proceedings to enforce this Security Deed and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

Time being of the essence of this contract, the Grantee shall have the right to terminate the Agreement and/or accelerate the maturity of the indebtedness under the Agreement and hereby secured, by declaring the entire indebtedness due under the Agreement to be in default and immediately due and payable, upon the failure of Grantor to make any payment when due, pursuant to the Agreement hereby secured, or upon any event of default or upon failure of Grantor to perform any obligation or make any payment required of Grantor by the terms of this deed or the aforesaid Agreement. Notwithstanding the foregoing, Grantee may delay or temporarily waive any rights under the Agreement or this Security Deed without losing them. Any such delay or waiver will not be a permanent waiver of that right or any other provision of the Agreement or of this Security Deed unless specifically so waived in writing signed by Grantee. Grantor may also release any person or property obligated under the Agreement or this Security Deed without causing the Grantee to lose any of its rights hereunder or in the Premises.

And the Grantor further covenants and agrees that the possession of said Premises, during the existence of said Agreement, by the Grantor, or any persons claiming under the Grantor, shall be that of tenant under the Grantee or assigns, during the due performance of all of the obligations aforesaid, and that in case of a sale under the power as hereinafter provided or by foreclosure by process of law, the Grantor, or any person in possession under the Grantor, shall forthwith deliver possession to the purchaser at such sale, or be summarily dispossessed, in accordance with the provisions of law applicable to tenants holding over.

Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. Grantor shall not do, not allow anyone else to do, anything affecting the Premises that is in the violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, or radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the



[redacted]

[redacted]

jurisdiction where the Premises is located that relate to health, safety or environmental protection.

We shall not demolish or remove any improvements from the Premises without your prior written consent. As a condition to the removal of any improvements, you may require us to make arrangements satisfactory to you to replace such improvements with improvements of at least equal value.

We shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Premises. We may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as we have notified you in writing prior to doing so and so long as, in your sole opinion, your interests in the Premises are not jeopardized. You may require us to post adequate security or a surety bond, reasonably satisfactory to you, to protect your interest.

We agree to neither abandon nor leave unattended the Premises. We shall do all other acts set forth above in this section, which from the character and use of the Premises are reasonably necessary to protect and preserve the Premises.

We warrant that the Premises and our use of the Premises complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

All promises, agreements and statements we have made in this Security Deed shall survive the execution and delivery of this Security Deed, shall be continuing in nature and shall remain in full force and effect until such time as the Agreement is paid in full.

Except as may be prohibited by applicable law, and subject to any notice required by applicable law, if we default on any term in the Agreement and/or of any term of this Security Deed, you may, in accordance with applicable law, pursue and enforce any rights you have under applicable law, including, without limitation, the right to: (i) accelerate all amounts due under the Agreement; (ii) foreclose upon this Security Deed and sell the Premises, either in whole or in part or in separate parcels at different times, if necessary, until the indebtedness due under the Agreement is satisfied or the Premises is exhausted, whichever occurs first; (iii) enter on and take possession of the Premises; (iv) collect the rental payments, including over-due rental payments, directly from tenants, and you are appointed as our agent and attorney-in-fact to collect any such rents by any appropriate proceeding; (v) manage the Premises, including signing, canceling and changing leases; and (vi) seek appointment of a receiver for the Premises and we hereby appoint you as our attorney-in-fact with authority to consent for us to the appointment of a receiver. This means that, among other rights you may pursue and enforce, you may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe under the Agreement and under this Security Deed. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. We agree that the interest rate set forth in the Agreement will continue before and after a default, entry of a judgment and foreclosure. Subject to applicable law, if you acquire the Premises at a forced sale following our default, our right to any insurance proceeds resulting from damage to the Premises prior to the acquisition shall pass to you to the extent of the sums secured by this Security Deed immediately prior to acquisition. In addition, subject to applicable law, you shall be entitled to collect all reasonable fees and costs actually incurred by you or your agents arising out of or related to this Security Deed or the Agreement, including, but not limited to, reasonable attorneys'



[redacted]

[redacted]

fees and costs of foreclosure, property preservation, documentary evidence, abstracts and title reports.

Except for any notice required under applicable law to be given in another manner, (a) any notice to Grantor provided for in this Security Deed shall be given by delivering it or by mailing such notice by regular first class mail addressed to Grantor at the last address appearing in Grantee's records or at such other address as Grantor may designate by notice to Grantee as provided herein, and (b) any notice to Grantee shall be given by certified mail, return receipt requested, to Grantee's address at: PNC Bank, National Association, P.O. Box 8800 Dayton, OH 45401-8800 or to such other address as Grantee may designate by notice to Grantor. Any notice provided for in this Security Deed shall be deemed to have been given to Grantor or Grantee when given in the manner designated herein.

GRANTOR HEREBY WAIVES ANY RIGHT GRANTOR MAY HAVE UNDER THE CONSTITUTION OF THE STATE OF GEORGIA OR THE CONSTITUTION OF THE UNITED STATES OF AMERICA TO NOTICE OR TO A JUDICIAL HEARING, OR BOTH, AND THAT ALL HOMESTEAD EXEMPTION RIGHTS, IF ANY, WHICH GRANTOR OR GRANTOR'S FAMILY MAY HAVE PURSUANT TO THE CONSTITUTION AND LAWS OF THE UNITED STATES, IN AND TO THE PREMISES AS AGAINST THE COLLECTION OF ANY PART OF THE DEBT SECURED HEREBY, PRIOR TO THE EXERCISE OF ANY RIGHT OR REMEDY PROVIDED TO GRANTEE HEREUNDER BY THIS DEED, AND GRANTOR WAIVES GRANTOR'S RIGHTS, IF ANY, TO SET ASIDE OR INVALIDATE ANY SALE UNDER POWER DULY CONSUMMATED IN ACCORDANCE WITH THE PROVISIONS OF THIS DEED ON THE GROUND (IF SUCH BE THE CASE) THAT THE SALE WAS CONSUMMATED WITHOUT PRIOR NOTICE OR JUDICIAL HEARING. ALL WAIVERS BY GRANTOR IN THIS PARAGRAPH HAVE BEEN MADE VOLUNTARILY, INTELLIGENTLY AND KNOWINGLY BY GRANTOR, AFTER GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO BE INFORMED BY COUNSEL OF GRANTOR'S CHOICE AS TO THE MEANING AND EFFECT HEREOF.

The power and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise and are granted as cumulative to the remedies for collection of said indebtedness provided by law.



[redacted]

[redacted]

IN WITNESS WHEREOF, the Grantor has hereto set his/her/their hand and seal the day and year first above written.

05/17/2022

- GRANTOR - HYUN WOOK LEE - DATE -

–Signed, sealed and delivered in the presence of:

Unofficial Witness

Shanneill Gayle-Huynh

Type or print witness' name

Notary Public, Fulton County

M PRADHAN
NOTARY PUBLIC
Gwinnett County
State of Georgia
My Comm. Expires March 23, 2023

**[Space Below This Line For Acknowledgment]**



[redacted]

# EXHIBIT "A" LEGAL DESCRIPTION



Account #: 27931463
Order Date : 05/09/2022
Reference : [redacted]
Name : HYUN W. LEE
Deed Ref : 53590/0463

Index #:
Registered Land:
Parcel #: [redacted]

SITUATED IN THE COUNTY OF GWINNETT, STATE OF GEORGIA:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 188 OF THE 7TH DISTRICT, GWINNETT COUNTY, GEORGIA, BEING LOT 18, BLOCK B, WOODWARD CROSSING, AS PER PLAT RECORDED IN PLAT BOOK 119, PAGES 88-90, GWINNETT COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

BEING THE SAME PROPERTY CONVEYED BY DEED RECORDED IN BOOK 53590, PAGE 0463 OF THE GWINNETT COUNTY, GEORGIA RECORDS.
SUBJECT TO ALL EASEMENTS, COVENANTS, CONDITIONS, RESERVATIONS, LEASES AND RESTRICTIONS OF RECORD, ALL LEGAL HIGHWAYS, ALL RIGHTS OF WAY, ALL ZONING, BUILDING AND OTHER LAWS, ORDINANCES AND REGULATIONS, ALL RIGHTS OF TENANTS IN POSSESSION, AND ALL REAL ESTATE TAXES AND ASSESSMENTS NOT YET DUE AND PAYABLE

Image: Gwinnett county Assessor's Online eFiling System

Tax Assessor's Office

## Property Detail

| | | | |
|---|---|---|---|
| LEE HYUN WOOK | | Property ID | |
| Mailing Address | | Alternate ID | |
| 2978 WOODWARD DOWN TRL | | Address | 2978 WOODWARD DOWN TRL |
| BUFORD, GA 30519-5048 | | Property Class | Residential SFR |
| Property Location | | Neighborhood | 22152043 Woodward Crossing |
| 2978 WOODWARD DOWN TRL | | Deeded Acres | 0.1200 |

## Value History

| Year | Reason | Appraised | | | Assessed | | | |
|---|---|---|---|---|---|---|---|---|
| | | Land | Improvements | Total | Land | Land Use | Improvements | Total |
| 2024 | Adjusted for Market Conditions | $87,000 | $340,200 | **$427,200** | $34,800 | $0 | $136,080 | **$170,880** |
| 2023 | Adjusted for Market Conditions | $87,000 | $355,100 | **$442,100** | $34,800 | $0 | $142,040 | **$176,840** |
| 2022 | Adjusted for Market Conditions | $67,000 | $317,800 | **$384,800** | $26,800 | $0 | $127,120 | **$153,920** |
| 2021 | Notice of Current Assessment | $50,800 | $207,300 | **$258,100** | $20,320 | $0 | $82,920 | **$103,240** |
| 2020 | Notice of Current Assessment | $50,800 | $207,300 | **$258,100** | $20,320 | $0 | $82,920 | **$103,240** |
| 2019 | Adjusted for Market Conditions | $50,800 | $207,300 | **$258,100** | $20,320 | $0 | $82,920 | **$103,240** |
| 2018 | Notice of Current Assessment | $45,000 | $188,700 | **$233,700** | $18,000 | $0 | $75,480 | **$93,480** |
| 2017 | Adjusted for Market Conditions | $45,000 | $188,700 | **$233,700** | $18,000 | $0 | $75,480 | **$93,480** |
| 2016 | New Bldg at Sale Price | $39,000 | $167,400 | **$206,400** | $15,600 | $0 | $66,960 | **$82,560** |
| 2015 | Adjusted for Market Conditions | $35,100 | $0 | **$35,100** | $14,040 | $0 | $0 | **$14,040** |
| 2014 | Notice of Current Assessment | $10,600 | $0 | **$10,600** | $4,240 | $0 | $0 | **$4,240** |
| 2013 | Adjusted for Market Conditions | $10,600 | $0 | **$10,600** | $4,240 | $0 | $0 | **$4,240** |
| 2012 | Adjusted to Sales Price | $11,300 | $0 | **$11,300** | $4,520 | $0 | $0 | **$4,520** |
| 2011 | Notice of Current Assessment | $12,200 | $0 | **$12,200** | $4,880 | $0 | $0 | **$4,880** |
| 2010 | Return Filed - Market Adjustme | $12,200 | $0 | **$12,200** | $4,880 | $0 | $0 | **$4,880** |
| 2009 | Land Value Adjusted For Market | $18,000 | $0 | **$18,000** | $7,200 | $0 | $0 | **$7,200** |
| 2008 | New Parcel | $30,600 | $0 | **$30,600** | $12,240 | $0 | $0 | **$12,240** |

## Sales History

| Book | Page | Date | Owner | Grantee | Type | Deed | Validity | Vacant Land | Sale Price |
|---|---|---|---|---|---|---|---|---|---|
| 53590 | 463 | 5/27/2015 | SDC GWINNETT LLC | LEE HYUN WOOK | S | Fu | Y | No | $206,400 |
| 53363 | 711 | 1/16/2015 | HIGHLAND FALLS LLC | SDC GWINNETT LLC | M | Fu | 1 | No | $440,000 |
| 53338 | 114 | 1/15/2015 | WLOF WOODWARD CROSSING LLC | HIGHLAND FALLS LLC | M | Fu | 1 | No | $440,000 |
| 50576 | 145 | 3/2/2011 | WALTON GEORGIA LLC | WLOF WOODWARD CROSSING LLC | M | Fu | 1 | Yes | $1,520,479 |
| 50458 | 753 | 12/27/2010 | SPARK 1 LLC | WALTON GEORGIA LLC | M | Fu | 1 | Yes | $1,470,000 |
| 50105 | 187 | 5/28/2010 | FIRST CITIZENS BANK AND TRUST COMPAN | SPARK 1 LLC | M | Fu | 1 | Yes | $900,000 |
| | | 1/5/2010 | SPARK 1 LLC | FIRST CITIZENS BANK AND TRUST COMPAN | M | Sp | N | Yes | $0 |
| 50084 | 142 | 1/5/2010 | GEORGIAN BANK | SPARK 1 LLC | M | Sp | 2 | Yes | $0 |
| 49243 | 355 | 1/6/2009 | Multiple Owners | GEORGIAN BANK | M | De | 1 | Yes | $5,742,535 |

## Land Details

| Primary Use | Land Type | Acres | Eff Frontage | Eff Depth |
|---|---|---|---|---|
| | | 0.1200 | 0.00 | 0.00 |

| Legal Description | |
|---|---|
| **Line** | **Description** |
| 1 | L18 BB WOODWARD CROSSING |

## R01 - Extension Details

| | |
|---|---|
| **Address** | 2978 WOODWARD DOWN TRL |
| **Type** | 2 Story Conventional |
| **Grade** | C |
| **Year Built** | 2015 |

Image

## Attributes

| Story | Attribute | Detail |
|---|---|---|
| | Type | 2 Story Conventional |
| | Occupancy | Single family |
| | Roof Structure | Gable-Hip |
| | Roof Cover | Comp sh 240-260# |
| | Heating | Forced hot air |
| | A/C | Central air |
| | Stories | 2.0 |
| | Bedrooms | 3 |
| | Bathrooms | 2 |
| | Bathrooms (Half) | 1 |
| | Feature | Fireplace |
| 1 | Exterior Wall | Wood siding |
| 1 | Interior Flooring | Base Allowance |
| 2 | Interior Flooring | Base Allowance |
| 2 | Exterior Wall | Wood siding |

## Floor Areas

| Code | Description | Gross | Finished | Construction |
|---|---|---|---|---|
| 1.0 | Floor Level | 900 | 900 | Wood frame |
| 2.0 | Floor Level | 1,320 | 1,320 | Wood frame |
| **Above Grade Living Area** | | 2,220 | 2,220 | |

## Exterior Features

| Code | Description | Size | Construction |
|---|---|---|---|
| ATTGAR | Attached Garage | 420 | Wood frame |
| CONCP | Concrete patio | 120 | |
| OMP | Open masonry porch | 56 | |